Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Apr 12 2012, 9:31 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**THOMAS C. ALLEN**
Fort Wayne, Indiana

**DANIEL G. PAPPAS**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**MICHAEL SPECIALE**
Indiana Department of Child Services
Fort Wayne, Indiana

**ROBERT J. HENKE**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| H.V. and O.P., | ) | |
| | ) | |
| Appellants-Respondents, | ) | |
| | ) | |
| vs. | ) | No. 02A05-1108-JT-506 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Charles F. Pratt, Judge
The Honorable Lori K. Morgan, Magistrate
Cause Nos. 02D08-1008-JT-304, 02D08-1008-JT-305, 02D08-1008-JT-308, 02D08-1008-JT-309, 02D08-1008-JT-310, 02D08-1008-JT-311, 02D08-1008-JT-312 and 02D08-1008-JT-313

April 12, 2012

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

O.P. ("Father") and H.V. ("Mother") appeal the involuntary termination of their parental rights to their respective children. In so doing, Father contends that he was denied due process of law, and thus the trial court erred in denying his motion to continue. In addition, Father and Mother both challenge the sufficiency of the evidence supporting the trial court's termination order.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Father is the alleged biological father of M.V., born in April 1998, and M.P.,[1] born in August 2004. Mother is the biological mother of M.V. and M.P., as well as My.V., born in May 2003, and two additional children.[2] Father and Mother have never been married, and Father has never established paternity of M.V. or M.P.

The facts most favorable to the trial court's judgment reveal that in July 2007, the local Allen County office of the Indiana Department of Child Services ("ACDCS") received and substantiated a referral for neglect and abuse against Mother for physically disciplining her two youngest children, M.P., and My.V., leaving bruising on their backs. In addition, Mother was not taking her medication for depression and anxiety as

---

[1] For clarification purposes we observe that M.P.'s last name was changed at some point during the underlying proceedings from M.V. to M.P. To avoid confusion, we shall refer to this child as M.P. throughout this opinion.

[2] The trial court's August 2011 judgment terminating Father's and Mother's respective parental rights to M.V. M.P., and My.V., also terminated Mother's parental rights to Ma.V. Mother's remaining biological child, Mo.V., has been placed with that child's father, and the termination proceedings pertaining to Mo.V. remain pending. Neither parent challenges the trial court's termination order as to Ma.V. We therefore limit our recitation of the facts to those pertinent solely to Father's and Mother's appeal of the termination of their respective parental rights to M.V., M.P., and My.V.

prescribed. She also admitted that she was struggling with caring for five children under the age of ten as a single parent.

This was not ACDCS's first encounter with Mother. In November 2006, ACDCS became involved with Mother when she agreed to sign a safety plan prohibiting the use of physical discipline in the home after her boyfriend, George Mitchell, had spanked two of the children. Mother was later required to sign a second safety plan in March 2007 after Mitchell spanked the children on another occasion.

Based on Mother's history of involvement with ACDCS and the circumstances surrounding the most recent referral, ACDCS filed petitions alleging all five children were children in need of services ("CHINS"). During an initial hearing in July 2007, Mother admitted to the allegations of the CHINS petition, and the children were so adjudicated. The trial court proceeded to disposition the same day.

On August 1, 2007, the trial court entered its dispositional order formally granting wardship of the children to ACDCS, but allowing the children to remain in the care of Mother as in-home CHINS. The court's dispositional order also incorporated a Parent Participation Plan which directed Mother to successfully complete a variety of tasks and services designed to improve her parenting skills and to facilitate reunification of the family. Among other things, Mother was ordered to: (1) refrain from all criminal activity; (2) maintain clean, safe, and appropriate housing at all times; (3) notify ACDCS within forty-eight (48) hours of all changes in household composition, housing, and, employment; (4) cooperate with all caseworkers and accept all announced and unannounced home visits; (5) obtain a psychological evaluation and follow all resulting

recommendations, including anger management counseling if recommended; (6) obtain a family functioning assessment at Caring About People Inc. and follow all recommendations; (7) successfully participate in and complete home-based services through Whiting Homes; and (8) refrain from physical discipline of the children at all times.

Mother began participating in several of the court-ordered services, but her participation was sporadic and "non-compliant." Transcript, Vol. 3, p. 90. She also refused to answer the door when ACDCS case managers attempted to visit the family home. On December 11, 2007, ACDCS received a referral that the children were not attending school regularly and that utilities in the family home had been turned off. ACDCS assessment case manager Terri Palmeter investigated the matter and substantiated that the water to the home had in fact been turned off and that the children had missed a significant amount of school. Although Father did not live with Mother and the children, he happened to be present at the time of Palmeter's assessment and indicated he would try to help Mother get the water to the home restored.

After providing Mother and Father with several hours to remedy the water situation, the parents admitted their efforts had been unsuccessful. In addition, ACDCS had ongoing concerns regarding (1) the lack of appropriate bedding and only minimal amounts of food in the home, (2) Mother's lack of cooperation with service providers, and (3) Mother's lack of medication management for herself and the children. Mother had also continued to allow her neighbor, who had a criminal record for disorderly conduct and battery on a child, supervise the children, alone, for extended periods of time

4

despite ACDCS's admonishments against such arrangements. For all these reasons, the children were taken into protective custody.

The next day, both Mother and Father participated in a supervised visit with the children at the local ACDCS office. During the visit, Palmeter provided Father with her name and contact information. She also asked Father for his current address and phone number. In addition, Palmeter informed Father of the specific date, time, and location of the pending detention hearing and further advised Father that he needed to establish paternity of M.V. and M.P. to preserve his parental rights to the children.

The detention hearing was held on December 13, 2007, as scheduled. Father failed to appear. Following the hearing, the trial court issued an order finding the children were not progressing well in their current placement with Mother and accepting ACDCS's recommendation that the children be placed in licensed foster care. The court also determined that the previously entered Parent Participation Plan continued to be appropriate. No specific dispositional orders for reunification services were entered as to Father. Later the same month, Mother was arrested while visiting with Father, who resided in Ohio, on possession of cocaine charges. She thereafter entered a guilty plea and was released on three years' probation in Indiana.

Mother returned to Indiana in June 2008 following her release from incarceration and began participating more regularly in services, including intensive home-based services and visits with the children. Because Mother appeared to be actively involved in and benefitting from services, the children were returned to her care in November 2008. By June 2009, however, Mother's participation in services had again become

inconsistent, and the children were removed from her care after Mother admitted to hitting M.V. with a belt. Several additional incidents of neglect and/or lack of supervision had also preceded the children's second removal from Mother including: (1) Mother's admission to having allowed the three oldest children to drive her van while she watched from outside, resulting in the car driving into a ditch with all the children inside; (2) Mother's steady disengagement and eventual unsuccessful discharge from home-based services; (3) Mother's failure to administer the children's medication as prescribed; and (4) Mother's refusal to take her own prescribed medications relating to her own mental health issues involving depression, anxiety, and bi-polar disorder.

ACDCS eventually filed petitions seeking the involuntary termination of Mother's and Father's parental rights to the children in August 2010. A consolidated evidentiary hearing held on seven different days and spanning a four-month period commenced in February 2011. During the evidentiary hearing, ACDCS presented substantial evidence concerning both Mother's and Father's past and current inability to adequately care for the children. Regarding Father, ACDCS presented evidence establishing that although Father was provided with actual notice of the detention hearing held within two days of the children's removal from Mother's care in December 2007, he failed to show. He thereafter refused to initiate contact with ACDCS and/or to participate in any CHINS court hearings. Father had also provided ACDCS with false or inaccurate contact information, resulting in Father being unreachable by telephone, as well as the return of numerous court orders and ACDCS mailings concerning CHINS review hearings, team meetings, and other pertinent information as undeliverable. Also significant, Father

6

never established paternity of either M.P. or M.V. In addition, Father was arrested in Indiana on drug-related charges in January 2010 and was later convicted for possession of a controlled substance. At the time of the termination hearing, Father remained incarcerated with an earliest projected release date of May 30, 2012.

As for Mother, ACDCS presented abundant evidence establishing that the circumstances resulting in the children's removal from Mother's care had remained largely unchanged and that Mother had made little or no progress in improving her parenting abilities. Specifically, the evidence established that throughout the underlying proceedings Mother changed residences at least seven different times, failed to maintain consistent employment, repeatedly engaged in relationships with violent and abusive men who abused both Mother and the children, continued to be unable to control the children's behavior and/or parent the children effectively during supervised visits, struggled with mental health and anger control issues, tested positive for marijuana three times, and continued to be non-compliant in taking her own medications as prescribed.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On July 15, 2011, the trial court entered its judgment terminating Mother's and Father's parental rights to their respective children. Both parents appeal.

## DISCUSSION AND DECISION

We begin our review by acknowledging that when reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id.

7

Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Here, in terminating Mother's and Father's parental rights, the trial court entered specific factual findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. L.S., 717 N.E.2d at 208.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. K.S., 750 N.E.2d at 837. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights can occur in Indiana, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2) (2010). The State's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). Moreover, Indiana Code Section 31-35-2-8(a) provides that if a trial court finds the allegations in the termination petition to be true, the court shall terminate parental rights.

Father and Mother raise separate allegations of error on appeal. Specifically, Father asserts that the trial court violated his constitutional right to due process by "failing to hold a (sic) initial hearing or a dispositional hearing relative to him in the underlying CHINS cause, and by failing to grant trial counsel's motion for continuance of the termination hearing." Appellant's Br. (Father) p. 1. Father also claims the trial court erred in finding that termination of his parental rights is in M.V.'s and M.P.'s best interests.

Mother's allegation of error focuses on the sufficiency of the evidence supporting the trial court's judgment terminating her parental rights to her two youngest children,

9

M.P. and My.V. Specifically, Mother contends that "the removal of the oldest three children from the family substantially changed the dynamics of the family to the point where she had demonstrated the ability to parent [M.P. and My.V.]" by the time of the termination hearing. Appellant's Br. (Mother) p. 13. Mother therefore contends she is entitled to reversal.

## I. Procedural Due Process

A parent's interest in the care, custody, and control of his or her children is arguably one of the oldest of our fundamental liberty interests. Bester, 839 N.E.2d at 147. Hence, "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. The Due Process Clause of the United States Constitution likewise "prohibits state action that deprives a person of life, liberty, or property without a fair proceeding." In re B.J., 879 N.E.2d 7, 16 (Ind. Ct. App. 2008), trans. denied. To be sure, the right to raise one's child is an "essential, basic right that is more precious than property rights." In re C.C., 788 N.E.2d 847, 852 (Ind. Ct. App. 2003), trans. denied. Thus, when the State seeks to terminate a parent-child relationship, it must do so in a manner that meets the constitutional requirements of the Due Process Clause. Hite v. Vanderburgh Cnty. Office of Family & Children, 845 N.E.2d 175, 181 (Ind. Ct. App. 2006). Although due process has never been precisely defined, the phrase embodies a requirement of "fundamental fairness." In re J.T., 740 N.E.2d 1261, 1264 (Ind. Ct. App. 2000), trans. denied.

Notwithstanding the significance of the rights involved herein, it is well-established, however, that a party on appeal may waive a constitutional claim. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003). In particular, we have previously held that a parent may waive a due process claim in a CHINS or involuntary termination case when it is raised for the first time on appeal. Id. at 194-95; see also In re K.S., 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001) (concluding mother waived claim that trial court violated her due process rights in failing to follow statutory requirements governing permanency hearings, case plans, and dispositional orders because she raised constitutional claim for first time on appeal). This is in keeping with the long-standing general rule that an issue cannot be raised for the first time on appeal. McBride, 798 N.E.2d at 194.

Father asserts for the first time on appeal that the trial court "never held an initial hearing or a dispositional hearing, nor entered a dispositional order in the underlying CHINS action" as to Father. Appellant Father's Br. p. 8. A review of the record makes clear, however, that Father did not object to any of these alleged deficiencies at any time during the CHINS proceedings. Father, who was appointed counsel at the commencement of the termination case and attended the termination hearing telephonically, also never argued during the termination proceedings that these alleged deficiencies during the CHINS case constituted a due process violation. Rather, Father has raised his procedural due process claim for the first time on appeal. We therefore conclude that Father has waived his constitutional challenge.

Waiver notwithstanding, we pause to note that Father's additional contention that the "record is silent as to whether he was properly served notice of the underlying CHINS proceedings" also rings hollow, as the uncontested testimony of ACDCS case manager Palmeter makes clear that she personally informed Father of the date, time, and location of the detention hearing during Father's and Mother's visit with the children in December 2007. Palmeter went on to testify that although she had asked Father for his current address and telephone number at that time, every case plan and court report she sent him "came back undeliverable[,] and the phone number [Father] provided did not work." Transcript, Vol. 3, p. 78-79.

By refusing to attend the CHINS hearing which Father had actual knowledge of and by failing to initiate any subsequent contact with ACDCS thereafter, Father has, at least in part, invited the alleged error of which he now complains. Error invited by the complaining party is not reversible error. See, e.g., Breining v. Harkness, 872 N.E.2d 155, 159 (Ind. Ct. App. 2007) (stating that the doctrine of invited error, grounded in estoppel, provides that a party may not take advantage of an error that he commits, invites, or which is the natural consequences of his own neglect or misconduct), trans. denied. Nor can we agree with Father's assertion that the alleged procedural irregularities which occurred in the CHINS proceedings operated to deprive Father of procedural due process in the termination case. Father was represented by counsel throughout the termination proceedings. In addition, Father appeared for the termination evidentiary hearing telephonically, was provided with an opportunity to be heard and to cross-examine witnesses, and was zealously represented by counsel. For all these

reasons, we cannot conclude Father's rights were fatally compromised.  See, e.g., Hite v. Vanderburgh Cnty. Office of Family & Children, 845 N.E.2d 175, 184 (Ind. Ct. App. 2006) (concluding that failure to provide father with notice during initial stages of the CHINS action and copies of case plans did not substantially increase risk or error in termination proceedings).

## II. Sufficiency of the Evidence

### A. Father - Best Interests

Both parents claim that the juvenile court's judgment is not supported by the evidence.  In so doing, Father states that he was "never ordered to comply with services because no dispositional hearing was held as to him."  Appellant's Br. (Father) p. 10.  He further claims that he "visited" and "supported" the children in the past and "did not use drugs around his children."  Id.  Father therefore contends there is insufficient evidence supporting the trial court's determination that termination of his parental rights is in M.V.'s and M.P.'s best interests.

We are mindful that when considering what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence.  McBride, 798 N.E.2d at 203.  In so doing, the trial court must subordinate the interests of the parent to those of the child. Id.  The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship.  Id.  Moreover, we have previously determined that the testimony of a child's guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests.  Id.

13

In determining that the termination of Father's parental rights is in M.V.'s and M.P.'s best interests, the trial court specifically found that all of the parents "continue to be unable, refuse, or neglect to provide for the basic necessities of a suitable home for the raising of said children." Appellant's Appendix (Father), p. 36. The court further found that Father had not been "significantly involved in the children's lives," failed to "establish paternity," did not "visit or have contact with the children," did not provide "financial or other material support for the children," and failed to "take any steps to participate in services or to put himself in a position to care for his children." Id. at 37. These findings are supported by the evidence.

During the termination hearing, case manager Palmeter, Guardian Ad Litem ("GAL") Robert Bellinger, and court-appointed special advocate ("CASA") Suzanne Lange all recommended termination of Father's parental rights as in M.P. and M.V.'s best interests. In so doing, Palmeter testified that it was "obvious from the beginning . . . that [Father] was not fully invested in his children due to the fact he didn't follow through with paternity [testing] so that child support could be established to assist [Mother]." Transcript, Vol. 3, pp. 102-03. Palmeter further explained that "through conversations with [Mother][,] it was kind of obvious that there'd been a history of domestic violence with [Father] in [Ohio]," and that there "were drug issues with [Father]." Id. Similarly, in recommending termination of Father's parental rights, CASA Bellinger informed the trial court that there had "never been any involvement" by any of the fathers involved in this case and that this "lack of involvement" by the fathers had left the children without a support system "both emotionally and financially." Id. at 104. GAL Bellinger likewise

14

testified that he believed termination of parental rights and adoption of the children was "necessary" given the circumstances of the case. Id. at 124.

Additional evidence from service providers confirmed the children's need for structure and permanency in their lives. For example, therapist Karen Palmer confirmed that M.V., who suffers with post traumatic stress disorder, attention deficit hyperactivity disorder, encopresis, and mild retardation, had been in residential therapy since April 2010 due to his extreme behaviors. Palmer further testified that M.P. needs a "very structured and routine environment" with a lot of "one on one" care due to his "low functioning level" and inability to "understand complex situations." Id., Vol. 1, pp. 135-36.

Based on the totality of the evidence, including Father's ongoing incarceration, failure to establish paternity of the children, unresolved substance abuse issues, and current inability to demonstrate he is capable of providing A.P. and A.V. with the safe and stable home environment the children need, coupled with the testimony from Palmeter, Bellinger, Lange, and Palmer, we conclude that clear and convincing evidence supports the trial court's determination that termination of Father's parental rights is in the children's best interests.

### B. Mother - Conditions Remedied/Threat to Well-Being

Finally, we consider Mother's assertion that there is insufficient evidence supporting the trial court's determination that there is a reasonable probability the conditions resulting in the children's removal from her care will not be remedied. As previously mentioned, Indiana's termination statute provides that ACDCS need establish

15

only one of the requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court may terminate parental rights. Because we find it to be dispositive under the facts of this particular case, we shall only consider whether clear and convincing evidence supports the trial court's findings regarding subsection (b)(2)(B)(i), namely, whether there is a reasonable probability the conditions resulting in the children's removal or continued placement outside the family home will be remedied.

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. The trial court may also consider any services offered to the parent by the local Indiana Department of Child Services office (here, ACDCS) and the parent's response to those services, as evidence of whether conditions will be remedied. Id. Moreover, ACDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

In the present case, the trial court's judgment contains numerous detailed findings regarding Mother's unresolved parenting issues. Specifically, the trial court noted ACDCS had made multiple referrals for services, including referrals for intensive family preservation services, home-based services, parenting classes, and anger management counseling but that Mother "failed to complete and/or benefit from [the] services provided." Appellant's Appendix (Father) p. 31. The court further found that Mother had moved approximately seven times since ACDCS's involvement with the family began in 2007, had "difficulty maintaining a clean and appropriate home for the children" during the underlying CHINS case, and required assistance in obtaining groceries on at least one occasion. Id. at 32. Although the trial court acknowledged in its findings that Mother had obtained employment at McDonalds on two prior occasions, it went on to find that she was "fired for failure to appear at work on time" and has "not consistently maintained employment. . . ." Id.

The trial court also detailed the testimony of numerous case workers and service providers regarding Mother's overall lack of progress in services, including her inability to safely parent the children and effectively manage each child's special needs. For example, the trial court noted the testimony from M.V.'s therapist that Mother had been unable to implement the coping skills, relaxation techniques, and parenting skills demonstrated to her while visiting with the children. Additional findings reflected testimony from other case workers who had observed that visits between Mother and all the children were "chaotic," that Mother sometimes "did not want to listen to advice and/or redirection" that visitation supervisors were giving her, and that visits eventually

17

reverted to in-office supervised visits by late March 2010 following an incident during which Mother allowed the three oldest children, ages eleven, nine, and eight, to drive the family van.

Finally, the trial court found Mother had "established a pattern of involvement with violent and abusive individuals and a pattern of exposing her children to those individuals who have often abused the children." Id. at 35. The court went on to acknowledge that the children had disclosed they do not feel safe with Mother and that Mother's "lack of good judgment and insight . . . has had a devastating impact on two of the children who suffer from Post Traumatic Stress Disorder and other significant diagnoses related to their treatment while in [Mother's] care." Id. A thorough review of the record leaves us satisfied that these findings, too, are supported by abundant evidence.

The record makes clear that at the time of the termination hearing, Mother had made little, if any, progress in her ability to care for the children and to provide them with a safe and stable home environment. Specifically, Mother had been unemployed for the majority of the underlying CHINS and termination cases, was arrested in Ohio on drug-related charges, tested positive for marijuana on three occasions following her release from incarceration in violation of the terms or her probation, and continued to be non-compliant in taking her mental health medications as prescribed as of the time of the termination hearing. Additionally, it was the general consensus among case workers and service providers that although Mother loved her children, her situation would likely never improve. For example when asked to describe Mother's "follow through" on the

18

"matters [ACDCS] wanted to address with her," ACDCS case manager Nakia Steele answered as follows:

> [Mother] would say that she would comply[,] but then again would fail to initiate any contact with service providers[.] [O]r she would say that she's gonna follow through and just wouldn't. . . . [W]henever we would have family team meetings, she would be real[ly] positive and maybe even bring a support system and say that she would follow through[,] but shortly thereafter there would be no compliance. So it was just basically an on-going thing of non-compliance with the Department.

Transcript, Vol. 1, p. 49. Similarly, SCAN restoration case worker Stacey Dickerson testified that she supervised in-home visits between Mother and the children and worked on a parenting curriculum with Mother between August 2008 and May 2009. When questioned about Mother's progress in services, Dickerson stated that although there was a brief time when Mother appeared to be progressing in services, by September 2008 her progress had become sporadic, and ultimately Mother "[d]idn't progress at all." Id. at 176. ACDCS case manager Palmeter likewise expressed ongoing concerns at the time of the termination hearing regarding Mother's unresolved anger management issues, history of involvement in abusive relationships, inability to demonstrate she is capable of supervising the children at all times, and historic inability to maintain a stable home and employment.

As noted earlier, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. D.D., 804 N.E.2d at 266. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing services, in conjunction with unchanged

conditions, supports a finding that there exists no reasonable probability that the conditions will change." Lang v. Starke Cnty. Office of Family & Children, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), trans. denied. Moreover, we have previously explained that "simply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change." In re J.S., 906 N.E.2d 226, 234 (Ind. Ct. App. 2009). Based on the foregoing, we conclude that clear and convincing evidence supports the trial court's findings as well as its ultimate determination to terminate Mother's parental rights to her children.

We will reverse a termination of parental rights "'only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made.'" In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford County Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

RILEY, J., and DARDEN, J., concur.